Amihai **MIRON**, Ayala Miron, AM Partners, AM Tuckerstown Investors, Inc., and AM Tuckerstown Investors, LLC, Plaintiffs,

v.

**BDO SEIDMAN, LLP,** Robert J. Dudzinsky, Deutsche Bank AG, David Parse, Deutsche Bank Securities, Inc. d/b/a Deutsche Bank Alex Brown, a Division of Deutsche Bank Securities, Inc., Raggi & Weinstein, LLP, CPAs & Consultants, and Bob Raggi, Defendants.

No. CIV.A.04–968.

United States District Court, E.D. Pennsylvania.

Oct. 20, 2004.

David Stewart Clancy, Jeven R. Sloan, W. Ralph Canada, Jr., Shore Deary LLP, David R. Deary, Fowler, Wiles, Norton and Keith, Dallas, TX, Joe R. Whatley, Jr., Cooper, Mitch, Crawford, Kuykendall and Whatley, Birmingham, AL, Kenneth I. Trujillo, Kathryn C. Harr, Trujillo Rodriquez & Richards, Philadelphia, PA, Othni J. Lathram, Whatley Drake LLC, Birmingham, AL, for Plaintiffs.

Daniel J. Layden, Piper Rudnick LLP, Philadelphia, PA, Benjamin Sokoly, Christine E. Harding, Lawrence M. Hill, Richard A. Nessler, Seth C. Farber, Dewey Ballantine LLP, New York, NY, Cheryl A. Krause, Hangley Aronchick Segal & Pudlin, M. Scott Gemberling, Jay S. Rothman, Marshall, Dennehey, Warner, Coleman and Goggin, Philadelphia, PA, for Defendants.

### MEMORANDUM AND ORDER

.JOYNER, District Judge.

Via the motions now pending before this Court, Defendants BDO Seidman, LLP and Robert J. Dudzinsky (collectively, the "BDO Defendants") and Defendants

Deutsche Bank AG, Deutsche Bank Securities, Inc. d/b/a Deutsche Bank Alex Brown, a division of Deutsche Bank Securities, Inc., and David Parse (collectively, the "Deutsche Bank Defendants") move to compel arbitration and dismiss or stay this action; Defendants Raggi & Weinstein LLP and Bob Raggi (the "Raggi Defendants") move to dismiss this action. For the reasons outlined below, the BDO Defendants' motion shall be GRANTED, the Deutsche Bank Defendants' motion shall be DENIED, and the Raggi Defendants' motion shall be DENIED without prejudice. All proceedings shall be stayed pending resolution of arbitration between Plaintiffs and the BDO Defendants.

### Factual Background

On July 24th, 2000, Plaintiff Amihai Miron entered into a consulting agreement (the "BDO Agreement") with Defendant BDO Seidman. The BDO Agreement included the following language:

> WHEREAS, Client or its designee is interested in transferring, by sale, lease or otherwise, some of its assets and limiting its financial exposure. (Such business operations, the "Business" and such transfer, as further defined in Paragraph 2 below, the "Transaction");
>
> WHEREAS, BDO is in the business of providing accounting and consulting services; and
>
> WHEREAS, Client desires BDO to provide certain tax and business consulting services in connection with the Transaction, and BDO desires to provide such services to Client, all upon the terms and conditions herein.

The BDO Agreement established that the BDO Defendants would provide "consulting services in conjunction with the sale of business assets including assistance in structuring the Transaction, [and] assisting Client and/or its advisors in determining a tax treatment for the Transac-

tion[.]" BDO Agreement, § 2(a). The Agreement also contained the following mandatory arbitration clause:

> If any dispute, controversy or claim arises in connection with the performance or breach of this Agreement and cannot be resolved . . . . then such dispute, controversy or claim shall be settled by arbitration in accordance with the laws of the Commonwealth of Pennsylvania. . ." BDO Agreement, § 8(d).

The sale transaction referred to in the BDO Agreement had in fact been completed in May 2000, two months before the Agreement was signed, and the BDO Defendants admit they played no part in structuring this transaction.

The services that the BDO Defendants did in fact provide related to foreign exchange digital option contracts (FX Contracts), marketed as a tax shelter called Currency Options Bring Reward Alternatives (COBRA). According to Plaintiffs' Complaint, the Raggi Defendants recommended the COBRA tax savings strategy to Plaintiffs once they became aware that Plaintiffs expected substantial gains from the May 2000 sale transaction. Complaint, ¶ 55, 56. Plaintiffs agreed to engage in the COBRA strategy based in large part on all of the Defendants' representations regarding the likelihood of payout under this strategy, the legality of the tax strategy, the likelihood of potential challenges by the IRS, and the independence of Jenkens & Gilchrist, the law firm providing opinion letters to participating clients. Complaint, ¶ 37, 66.

In order to implement the COBRA tax strategy, and in connection with the formation of several entities through which Plaintiffs planned to engage in FX Contracts, Plaintiff Amihai Miron opened three brokerage accounts with Defendant Deutsche Bank Securities, Inc. On August 24, 2000, Mr. Miron executed three identi-

cal account agreements (the "DB Agreements"), binding on all Plaintiffs and the Deutsche Bank Defendants, containing the following arbitration clause:

> I agree to arbitrate with you any controversies which may arise, whether or not based on events occurring prior to the date of this agreement, including any controversy arising out of or relating to any account with you, to the construction, performance, or breach of any agreement with you, or to transactions with or through you, only before the New York Stock Exchange or the National Association of Securities Dealers Regulation, Inc., at my election.

Plaintiffs, who claim financial losses as a result of the COBRA tax strategy, allege that Defendants defrauded them by misrepresenting the possibility of profit under the FX Contracts, failing to disclose that Defendants had "virtually unlimited discretion" to determine whether the FX Contracts would in fact pay out, misrepresenting the likelihood of IRS challenges, and failing to keep Plaintiffs apprised of IRS developments such that Plaintiffs could protect their financial and legal interests. Plaintiffs now bring claims against Defendants alleging RICO violations, civil conspiracy, breach of contract, breach of fiduciary duty, fraud, negligent misrepresentation, professional malpractice, unjust enrichment, excessive and illegal fees, and seek a declaratory judgment that the BDO Agreement and the FX Contracts are unenforceable.

The BDO Defendants have moved to compel arbitration on the basis of the BDO Agreement § 8(d) arbitration clause. The Deutsche Bank Defendants have moved to compel arbitration on the basis of the arbitration clauses in both the DB Agreement and the BDO Agreement. The Raggi Defendants move to dismiss the claims against them on a variety of grounds.

## Discussion

### I. FAA Requirements for Arbitration

■ At its heart, arbitration is a matter of contract. "[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Tech., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960)).

■ Under the Federal Arbitration Act and Pennsylvania law, a district court must compel arbitration if it finds (1) that a valid arbitration agreement exists between the parties, and (2) that the dispute before it falls within the scope of this agreement. *McAlister v. Sentry Ins. Co.*, 958 F.2d 550, 553 (3rd Cir.1992); *See* 9 U.S.C. § 3.

■ The Supreme Court has held that a presumption of arbitrability exists where a contract contains an arbitration clause, and that an order to arbitrate should not be denied "unless it may be said with positive assurance that the arbitration clause is not susceptible to an interpretation that covers the asserted dispute." *AT & T*, 475 U.S. at 650, 106 S.Ct. 1415. Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration. *Green Tree Fin. Corp. v. Bazzle*, 539 U.S. 444, 452, 123 S.Ct. 2402, 156 L.Ed.2d 414 (2003); *see also Tripp v. Renaissance Advantage Charter Sch.*, No. 02–9366, 2003 U.S. Dist. LEXIS 19834 at *7, 2003 WL 22519433 at *2 (E.D.Pa.2003) (quoting *Great W. Mortgage Corp. v. Peacock*, 110 F.3d 222, 228 (3rd Cir.1997)).

■ The presumption of arbitrability is particularly strong when the arbitration clause in question is broad. *AT & T*, 475 U.S. at 657, 106 S.Ct. 1415; *Brayman Constr. Corp. v. Home Ins. Co.*, 319 F.3d 622, 625 (3rd Cir.2003); *Tripp*, 2003 U.S.

Dist. LEXIS 19834 at *11, 2003 WL 22519433 at *3. To overcome this presumption as applied to broad arbitration agreements, a party must either establish the existence of an express provision excluding the grievance from arbitration, or provide "the most forceful evidence of a purpose to exclude the claim from arbitration." *AT & T,* 475 U.S. at 650, 106 S.Ct. 1415 (quoting *United Steelworkers of Am.,* 363 U.S. at 584–85, 80 S.Ct. 1347).

## II. *Arbitration of Plaintiffs' Claims Against BDO*

This Court finds that Plaintiffs' claims against the BDO Defendants must be submitted to arbitration, because § 8(d) of the BDO Agreement is a valid arbitration agreement, and the claims against the BDO Defendants fall within the scope of this agreement.

### A. *Validity of the BDO Arbitration Agreement*

█ As to the first part of the *McAlister* test, we find that the BDO Agreement contains a "valid arbitration agreement" between Plaintiffs and the BDO Defendants. *McAlister,* 958 F.2d at 553. Nothing suggests that the parties did not intent to be bound by the § 8(d) arbitration clause, and the facts of this case do not indicate that the BDO Agreement is void due to fraud.

Plaintiffs compare the facts of this case to those in *Denney v. Jenkens & Gilchrist,* 340 F.Supp.2d 338 (S.D.N.Y.2004), dealing with a similar tax planning strategy and consulting agreement, and urge this Court to follow the holding of that case. In *Denney,* the United States District Court for the Southern District of New York refused to compel arbitration on the grounds that the consulting agreement at issue (and, by extension, the arbitration clause within the agreement) was void due to mutual fraud. *Denney,* 340 F.Supp.2d at 347, 2004 WL 936843 at *6–7. Judge

Scheindlin based her finding of mutual fraud on a number of factors, including both parties' admission that the tax shelter services provided by defendant BDO Seidman had "nothing to do with" the transaction at the heart of the consulting agreement, and that the agreement was drawn up as "some kind of trick" to prevent third parties from discovering the true nature of the consulting relationship between Denney and BDO. *Id.* at 346, 2004 WL 936843 at *5–6. These admissions, coupled with Judge Scheindlin's concern over the "extraordinarily vague language" of the agreement, led her to conclude that "both sides were in on the wink and the nod;" this conclusion was not challenged by either party. *Id.* at 347, 2004 WL 936843 at *5–6.

While the language of the BDO Agreement in this case is indeed similar to the language of the consulting agreement in *Denney,* we find that the facts of the instant case are not similarly suggestive of mutual fraud. First, it is far from clear that the parties in this case "entered into agreements that described consulting work that was never performed." *Id.* at 346, 2004 WL 936843 at *5–6. Both Miron's and Denney's agreements with BDO specified that BDO would provide consulting and tax advice relating to the transactions and expansions in question. However, unlike the agreement in *Denney,* which identified expanding business operations as the client's only goal, the BDO Agreement identified one of Plaintiffs' goals as "limiting [their] financial exposure" in connection with the May 2000 sale transaction. While it is true that this transaction was complete by the time the BDO Agreement was signed (as was also the case in *Denney*), Plaintiffs indicate in their Complaint that they entered into the Agreement for the purpose of implementing a tax savings strategy, specifically with respect to the "substantial gains" from the May 2000

transaction cited in the BDO Agreement. *See* Complaint, ¶ 55–56, ¶ 66. Thus, while the BDO Defendants may not have performed all of the consulting work described in the BDO Agreement, they appear to have provided "tax ... consulting services in connection with the Transaction" as specified in the Whereas clauses.

Furthermore, the record in this case, unlike in *Denney*, includes no admissions suggestive of mutual fraud. The BDO Defendants affirm that the tax planning services actually provided to Plaintiffs in this case were closely tied to the services described in the BDO Agreement. Neither Plaintiffs nor the BDO Defendants have made any statements suggesting that they intended, respectively, to conceal the true nature of the services provided. Finally, both parties affirmatively deny that the BDO Agreement was a "wink and a nod" arrangement. Because the record in this case does not suggest a mutual intent to enter into a fraudulent agreement, we find that the arbitration clause within the BDO Agreement is valid and enforceable.

### B. *Scope of the BDO Arbitration Agreement*

■ In light of the presumption of arbitrability under the FAA, we find that Plaintiffs' claims regarding the BDO Defendants' tax planning and marketing activities fall within the scope of the BDO Agreement's broad arbitration clause.

■ When an arbitration clause provides for arbitration of all matters "arising under" or "arising out of" a particular agreement, the clause is typically construed broadly to suggest that a given dispute is arbitrable. *Medtronic Ave Inc. v. Cordis Corp.*, 100 Fed.Appx. 865, 868–69 (3rd Cir.2004) (compelling arbitration where the arbitration clause was broad and governed "any dispute, claim, or controversy arising from or relating to this Agreement or alleged breaches thereof");

*Berkery v. Cross Country Bank*, 256 F.Supp.2d 359, 366 (E.D.Pa.2003) (compelling arbitration where the arbitration clause was broad and covered "all claims, demands, or disputes" that "in any way relate to or arise out of this Agreement"); *Battaglia v. McKendry*, 233 F.3d 720, 727 (3rd Cir.2000).

The BDO Agreement arbitration clause is broad on its face, governing "any dispute, controversy or claim aris[ing] in connection with the performance or breach of this Agreement." While Plaintiffs contend that the inclusion of the limiting phrase "in connection with the performance or breach of this Agreement" supports a narrower reading of the clause, this position is consistent neither with Third Circuit precedent nor with the United States District Court for the Southern District of New York's second decision in *Denney*, upon which Plaintiffs rely. *Denney v. Jenkens & Gilchrist*, 340 F.Supp.2d at 352, 2004 WL 1367179 at *4 (S.D.N.Y.2004) (holding that the arbitration clause within a BDO Seidman consulting agreement, covering "any dispute, controversy or claim [that] arises in connection with the performance or breach of this Agreement," was to be broadly construed).

Plaintiffs will not succeed in rebutting the presumption of arbitrability in this case, as they have failed to present "the most forceful evidence" of an intent to exclude their claims from arbitration, such that this Court could find "with positive assurance" that no interpretation of the BDO Agreement arbitration clause would cover the claims. *See AT & T*, 475 U.S. at 650, 106 S.Ct. 1415. The heart of Plaintiffs' Complaint with respect to the BDO Defendants is that BDO defrauded Plaintiffs by marketing the COBRA tax strategy without informing Plaintiffs that this strategy might be subject to IRS challenges. Plaintiffs deny that these fraudu-

lent activities are related in any way to the services agreed to in the BDO Agreement, and allege that the services actually provided by the BDO Defendants in connection with the COBRA tax strategy were performed pursuant to "oral or implied contracts." Complaint, ¶ 223. However, as this Court emphasized above, § 2(a) of the BDO Agreement specifically required the BDO Defendants to provide "consulting services in conjunction with the sale of business assets including assistance . . . in determining a tax treatment for the Transaction . . . ," and identified as one of Plaintiffs' goals "limiting [their] financial exposure" in connection with the Transaction. In their Complaint, Plaintiffs admit that they entered into the BDO Agreement for the purpose of implementing a tax savings strategy with respect to the "substantial gains from the sale of certain business holdings in 2000," the very same Transaction referred to in the Agreement. *See* Complaint, ¶ 55–56, ¶ 66. Plaintiffs' allegations against the BDO Defendants all relate to the COBRA tax savings strategy, which was tailored to meet Plaintiff's financial needs resulting from the Transaction by providing a favorable tax treatment for its proceeds. Given that Plaintiffs' claims regarding the faulty tax strategy arguably arose "in connection with the performance or breach" of an agreement to assist Plaintiff "in determining a tax treatment for the Transaction" (language of the BDO Agreement), this Court cannot say "with positive assurance" that no interpretation of the arbitration clause would cover the current dispute. *See AT & T,* 475 U.S. at 650, 106 S.Ct. 1415. Therefore, we will grant the BDO Defendant's motion to compel arbitration with respect to the claims against them.

### III. *Arbitration of Plaintiffs' Claims Against Deutsche Bank*

The Deutsche Bank Defendants seek to compel arbitration of Plaintiffs' claims against them based on the arbitration clauses in the DB Agreements, or, alternatively, based on the arbitration clause in the BDO Agreement. We find that neither the DB Agreements nor the BDO Agreement require that Plaintiffs' claims against the Deutsche Bank Defendants be sent to arbitration at this time.

### A. *Arbitration under the DB Agreement*

■ Both Plaintiffs and the Deutsche Bank Defendants admit that the DB Agreement contains a valid arbitration clause, and agree that this dispute would normally fall within the scope of that clause. *See McAlister,* 958 F.2d at 553. Both parties further admit that the Deutsche Bank Defendants are prohibited by National Association of Securities Dealers Rules (NASD Rules) from seeking arbitration at this point in time due to the pendency of the class action litigation in *Denney v. Jenkens & Gilchrist,* No. 03–5460 (S.D.N.Y.2003). NASD Rule 10301(d)(3) prohibits members from seeking enforcement of an arbitration agreement against a member of a putative or certified class with respect to any claims encompassed by the class action until:

(A) the class certification is denied; (B) the class is decertified; (C) the customer, other member or person associated with a member is excluded from the class by the court; or (D) the customer, other member or person associated with a member elects not to participate in the putative or certified class action or, if applicable, has complied with any conditions for withdrawing from the class prescribed by the court. NASD Code of Arbitration Procedure Rule 10301(d)(3).

Because Plaintiffs are members of the putative *Denney* class as it is currently defined, the Deutsche Bank Defendants may

not seek to compel arbitration on the basis of the DB Agreement.

### B. *Arbitration Under the BDO Agreement*

In the alternative, the Deutsche Bank Defendants move to compel arbitration of Plaintiffs' claims against them pursuant to the arbitration clause within the BDO Agreement, which this Court has already found to be valid as applied to Plaintiffs' claims against the BDO Defendants. The issue yet to be resolved is whether Plaintiffs' claims against the Deutsche Bank Defendants, non-signatories to the BDO Agreement, likewise fall within its scope. We find that they do not.

The Deutsche Bank Defendants offer three theories as to why the claims against them should be arbitrated pursuant to the BDO Agreement. First, they argue that because the BDO Agreement arbitration clause is broad, the presumption of arbitrability should apply to all claims arising in connection with BDO's performance under the agreement, even those claims asserted against non-signatories. However, the presumption of arbitrability has never been extended to claims by or against non-signatories. *See, e.g., Medtronic Ave Inc. v. Cordis Corp.,* 100 Fed.Appx. 865, 868 (3rd Cir.2004) (quoting the 7th Circuit's finding in *Sweet Dreams Unlimited, Inc. v. Dial–A–Mattress International, Ltd.,* 1 F.3d 639, 642 (7th Cir.1993) that a broad arbitration clause covered "any dispute *between the contracting parties* that is in any way connected to their contract") (emphasis added).

■ Because arbitration is a matter of contract, exceptional circumstances must apply before a court will impose a contractual agreement to arbitrate on a non-contracting party. *Thomson–CSF, S.A. v. American Arbitration Ass'n,* 64 F.3d 773, 779 (2nd Cir.1995); *see also AT & T Tech.,* 475 U.S. at 650, 106 S.Ct. 1415. There are, however, five established theo-

ries under which non-signatories may be bound to the arbitration agreements of others: (1) incorporation by reference; (2) assumption; (3) agency; (4) veil-piercing/alter ego; and (5) estoppel. *Amkor Technology, Inc. v. Alcatel Business Systems,* 278 F.Supp.2d 519, 521 (E.D.Pa. 2003) (citing *Thomson–CSF,* 64 F.3d at 776). Furthermore, where the party seeking enforcement of the arbitration clause is a willing non-signatory, as here, an alternative theory of reverse estoppel may apply. *Thomson–CSF,* 64 F.3d at 779. The Deutsche Bank Defendants contend that they can enforce the BDO arbitration agreement as to the claims against them under two of these theories—agency and equitable estoppel.

■ Agency logic has been applied by the Third Circuit to bind non-signatories to arbitration agreements. *Pritzker v. Merrill Lynch, Pierce, Fenner & Smith,* 7 F.3d 1110, 1122 (3rd Cir.1993) (binding a non-signatory business entity to the arbitration agreement of it "corporate sister"). The Deutsche Bank Defendants cite a string of non-binding cases to persuade this Court to consider them agents of the BDO Defendants simply because both parties have been accused of civil conspiracy. *See Camferdam v. Ernst & Young Intern., Inc.,* No. 02–10100, 2004 WL 307292 at *6 (S.D.N.Y.2004) ("A civil conspiracy is a kind of partnership, in which each member becomes the agent of the other," quoting *Roberson v. Money Tree,* 954 F.Supp. 1519, 1529 (M.D.Ala.1997)). This we decline to do, in part because no court in this Circuit has ever concluded that an agency relationship can arise solely as a result of allegations of conspiracy. *See Reibstein v. CEDU/Rocky Mt. Academy,* No. 00–1781, 2000 U.S. Dist. LEXIS 18206 at 26, 2000 WL 1858718 at *8 (E.D.Pa.2000) (outlining the four types of agency under Pennsylvania law). Furthermore, it seems some-

what disingenuous for the Deutsche Bank Defendants to admit an agency relationship for the purposes of compelling arbitration while simultaneously defending against substantive charges of conspiracy.

 With respect to equitable estoppel, there are two theories of estoppel under which the Deutsche Bank Defendants may be able to compel arbitration. The first and more traditional theory allows signatories to impose arbitration on non-signatories when the non-signatory knowingly embraces, exploits, or receives the benefits of the agreement containing the arbitration clause, despite having never signed it. *See E.I. DuPont de Nemours and Co. v. Rhone Poulenc Fiber and Resin Intermediates, S.A.S.,* 269 F.3d 187, 199 (3rd Cir.2001); *Thomson–CSF,* 64 F.3d at 778; *Bannett v. Hankin,* 331 F.Supp.2d 354, 359–60 (E.D.Pa.2004) (compelling arbitration by estoppel where the signatory's claims against a non-signatory "make reference to or presume the existence of" the written agreement, or "arise out of and relate directly to" the agreement). This theory is somewhat inapplicable in this case given that here, the non-signatory Defendants are seeking to enforce the arbitration agreement. Furthermore, there is no evidence that the Deutsche Bank Defendants had any duties or received any direct benefits under the terms of the BDO Agreement.

 The more appropriate theory of estoppel in this case is "alternative estoppel," which will bind a signatory to arbitrate at a non-signatory's insistence where there is an "obvious and close nexus" between the non-signatories and the contract or the contracting parties. *Reibstein,* 2000 WL 1858718 at *5. The two-part test for alternative estoppel requires a court to determine whether there is a "close relationship between the entities involved," and examine the "relationship of the alleged wrongs to the nonsignatory's

obligations and duties in the contract." *E.I. DuPont,* 269 F.3d at 199 (citing *Thomson–CSF,* 64 F.3d at 779); *see also Bannett,* 331 F.Supp.2d at 360. To satisfy the second part of the test, the non-signatory seeking enforcement of an arbitration agreement must show that the claims against them are "intimately founded in and intertwined with" the underlying obligations of the contract to which they were not a party. *E.I. DuPont,* 269 F.3d at 199 (citing *Thomson–CSF,* 64 F.3d at 779).

 We find the theory of alternative estoppel is inappropriate here because Plaintiffs' claims against the Deutsche Bank Defendants are not "intimately founded in" or "intertwined with" the BDO Agreement. *Id.* The essential question in situations such as these is whether Plaintiffs would have an independent right to recover against the non-signatory Defendants even if the contract containing the arbitration clause were void. *Massen v. Cliff,* 02–9282, 2003 U.S. Dist. LEXIS 7392 at *14, 2003 WL 2012404 at *4 (S.D.N.Y. 2003). "The plaintiff's *actual dependence* on the underlying contract in making out the claim against the nonsignatory defendant is therefore always the sine qua non of an appropriate situation for applying equitable estoppel." *In re Humana Inc. Managed Care Litig.,* 285 F.3d 971, 976 (11th Cir.2002) (rev'd on other grounds, *PacifiCare Health Sys. v. Book,* 538 U.S. 401, 123 S.Ct. 1531, 155 L.Ed.2d 578 (2003)) (emphasis added). In *In re Humana,* the Eleventh Circuit held that equitable estoppel was inappropriate where plaintiffs brought a RICO suit against a non-signatory defendant, because the RICO claims were based on a statutory remedy apart from any available remedy for breach of the underlying contract. *In re Humana,* 285 F.3d at 976.

We find the Eleventh Circuit's reasoning compelling. In the instant case, Plaintiffs'

claims against the Deutsche Bank Defendants (specifically, claims of RICO violations, unjust enrichment, breach of contract, breach of fiduciary duty, unethical, excessive, and illegal fees, and civil conspiracy) are completely independent of the BDO Agreement. Nowhere in Plaintiffs' Complaint are the allegations against the Deutsche Bank Defendants tied to any obligations these Defendants had or benefits they may have received under the terms of the BDO Agreement (which in fact makes no mention of Deutsche Bank). Were this Court to find the BDO Agreement void, invalid, or unenforceable, Plaintiffs would still have valid causes of action against the Deutsche Bank Defendants grounded both in common law and statutory remedies. Because Plaintiff's claims against the Deutsche Bank Defendants do not depend on and are not intertwined with the BDO Agreement, these Defendants cannot enforce the BDO arbitration clause under a theory of alternative estoppel.

## IV. *Disposition of the Present Action*

This Court is required under the plain language of § 3 of the FAA to stay Plaintiffs' claims against the BDO Defendants pending arbitration.[1] *See Lloyd v. Hovensa,* 369 F.3d 263, 269 (3rd Cir.2004) (holding that the plain language of the FAA affords a court no discretion to dismiss a case where one of the parties applies for a stay pending arbitration).

■■■ We find that a stay is likewise appropriate with respect to Plaintiff's remaining claims against the Raggi Defendants and the Deutsche Bank Defendants. Although these claims are not subject to

arbitration, the FAA's requirement that a court stay "the trial of the action" suggests that the proceedings must be stayed in their entirety, even when the action encompasses both arbitrable and non-arbitrable claims. *See Feinberg v. Ass'n of Trial Lawyers Assur.,* No. 01–6966, 2002 U.S. Dist. LEXIS 21518 at *7–8, 2002 WL 31478866 at *2–3 (E.D.Pa.2002) (court elected to stay entire proceedings pending arbitration even though only some of plaintiff's claims were covered by the arbitration agreement); *Davies v. Ecogen Inc.,* No. 98–299, 1998 U.S. Dist. LEXIS 5363 at *3, 1998 WL 229780 at *1 (E.D.Pa.1998) ("[C]ourts have typically granted stays when there are both arbitrable and non-arbitrable claims in the same action and significant overlap exists between parties and issues"); *see also Landis v. North American Co.,* 299 U.S. 248, 254, 57 S.Ct. 163, 81 L.Ed. 153 (1936) (finding that a court's power to stay proceedings is incidental to the power to control its docket "with economy of time and effort for itself, for counsel, and for litigants"). Because there is substantial overlap in the charges against these various Defendants, particularly with respect to the RICO and civil conspiracy claims, we elect to stay the entirety of the proceedings pending arbitration of the claims against the BDO Defendants.

An appropriate Order follows.

## *ORDER*

AND NOW, this 20th day of October, 2004, upon consideration of the BDO Defendants' Motion to Compel Arbitration and Dismiss or Stay this Action (Doc. No.

---

1. "If any suit or proceeding be brought in any of the courts of the United States upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which such suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, *shall* on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement, providing the applicant for the stay is not in default in proceeding with such arbitration." 9 U.S.C. § 3 (emphasis added)

38) and all responses thereto (Docs. No. 44, 51, 59, 66), the Deutsche Bank Defendants' Motion to Compel Arbitration and Dismiss or Stay this Action (Doc. No. 40) and all responses thereto (Docs. No. 45, 49, 53), and the Raggi Defendants' Motion to Dismiss (Docs. No. 42, 43) and all responses thereto (Docs. No. 61, 68), it is hereby ORDERED that:

(1) The BDO Defendants' Motion to Compel Arbitration is GRANTED;

(2) The Deutsche Bank Defendants' Motion to Compel Arbitration is DENIED;

(3) The Raggi Defendants' Motion to Dismiss is DENIED WITHOUT PREJUDICE.

Plaintiffs and the BDO Defendants are hereby DIRECTED to proceed with arbitration pursuant to the terms and conditions contractually agreed to by those parties in the Agreement dated July 24, 2000. It is further DECREED that the proceedings before this Court shall be STAYED pending resolution of arbitration.